# EXHIBIT A

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

3:94CV307-P

FILED
CHARLOTTE, N.C.

MAY 1 3 1997

U.S. DISTRICT COURT
W. DIST. OF N.C.

| | | |
|---|---|---|
| RICHARD BLOOD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | J U D G M E N T |
| | ) | |
| TITAN SPORTS, INC. (d/b/a The World Wrestling Federation and the WWF), a Delaware Corporation, and A&H VIDEO SALES REPRESENTATIVES, INC. (d/b/a Coliseum Video), a New York Corporation, | ) | |
| Defendants. | ) | |

In accordance with the Memorandum of Decision and Order filed simultaneously herewith,

IT IS ORDERED, ADJUDGED, AND DECREED that Titan's Motion for Summary Judgment is **GRANTED** except insofar as the Motion concerns Blood's claim for injunctive relief as that claim for relief relates to merchandise not covered by the Copyright Act.

The Court hereby grants Blood's request for injunctive relief insofar as it relates to such merchandise and Titan is hereby **ENJOINED** from licensing or selling any merchandise not covered by the Copyright Act which incorporates the "Ricky 'the Dragon' Steamboat" mark.

This the _17th_ day of May, 1997.

ROBERT D. POTTER
SENIOR UNITED STATES DISTRICT JUDGE

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

3:94CV307-P

**F I L E D**
CHARLOTTE, N.C.

MAY 1 3 1997

U.S. DISTRICT COURT
W. DIST. OF N.C.

RICHARD BLOOD,                              )
                                            )
    Plaintiff,                          )
                                            )
vs.                                         )
                                            )
TITAN SPORTS, INC. (d/b/a The World         )
Wrestling Federation and the WWF), a        )
Delaware Corporation, and A&H VIDEO         )
SALES REPRESENTATIVES, INC. (d/b/a          )
Coliseum Video), a New York Corporation,    )
                                            )
    Defendants.                         )
_____)

<u>MEMORANDUM OF
DECISION & ORDER</u>

THIS MATTER is before the Court on the Defendant's motion for summary judgment.
For the reasons stated herein, that motion will be granted in part, but Titan will be enjoined from
licensing or selling any merchandise not covered by the Copyright Act which incorporates the
"Ricky 'the Dragon' Steamboat" mark.

## I. BACKGROUND

This dispute centers on the ownership of intellectual property rights to the professional
wrestling persona of "Ricky 'the Dragon' Steamboat" and the revenue generated by the sale of
videocassettes and other products marketed by incorporating that persona's name and likeness.
The Plaintiff, Richard Blood, is a professional wrestler identified known as "Ricky 'the Dragon'
Steamboat." Defendant Titan Sports Inc., does business as "The World Wrestling Federation" or
the "WWF". During the period in question Titan has purported to license and authorize the
marketing of numerous products employing the "Ricky 'the Dragon' Steamboat" persona.  In
addition, A&H Video Sales Representatives Inc., which does business as Coliseum Video, has

marketed videocassettes including performances by "Ricky 'the Dragon' Steamboat" in conjunction with Titan.   Blood claims that he is entitled to royalties or revenues generated by these products.

The evidence before the Court contains the following indisputable facts.  Blood has promoted himself as a professional wrestler since approximately June of 1976. Initially, Blood promoted himself as "Ricky Steamboat."  From 1976 through 1984 Blood wrestled for various wrestling organizations using that sobriquet and he enjoyed professional success not at issue here. During this period Blood began to parlay his wrestling notoriety into business ventures such as his health club which is known as "Steamboat's Mid-Atlantic Gym."

Blood began wrestling for the WWF in 1985.  At or about this time, Blood's wrestling identity was changed to "Ricky 'the Dragon' Steamboat."  Blood claims that he developed the "Dragon" concept in a round-table discussion at the house of Vincent K. McMahon who owns and controls Titan (his wife, Linda McMahon, is its only other director), and Titan has pointed to no evidence that undermines Blood's claim to the name and persona.

Blood wrestled for the WWF from 1985 through approximately April of 1988.  But the parties did not execute a written contract to govern their relationship during this period.  Instead, Blood was paid (like other wrestlers) according to the informal custom of the wrestling industry with McMahon determining, after the event, how much Blood should receive for his performance. This informal procedure explains why wrestlers call their post-event pay the "chef's surprise" and such cooking methods go a long way towards explaining the origin of this case.

In any event, around the time Blood joined the WWF Titan was implementing a licensing program whereby the unique characters and personas of the wrestlers would be exploited via the sale of merchandise and its film library would be exploited via the sale of videocassettes through

A&H. Titan told wrestlers about its plans in various letters, and it disclosed the royalty system it had created to govern when wrestlers would receive royalties as well as the amount of royalty payments. According to that royalty scheme Titan would pay wrestlers royalties only on videocassettes in which the wrestler was the featured performer, but it would not pay any royalties on videocassettes in which the wrestler appeared along with others, and it would pay royalties on other merchandise such as dolls, playing cards, and lunch boxes according to a set formula.

At least at the outset Titan proceeded with this licensing program unilaterally, without obtaining the express written consent of the wrestlers. Later Titan sought and obtained written contracts ("booking agreements") from WWF wrestlers for the purpose of establishing Titan's rights to license products utilizing the marks of its wrestlers. These booking agreements also set forth the terms and conditions on which Titan would pay to wrestlers royalties that were generated by such products incorporating their persona.

But Blood and the WWF never executed one of these booking agreements even though Blood wrestled in WWF events from 1985 through about April of 1988 and he was paid for those events consistent with the custom in the industry. Linda McMahon tendered a booking agreement to Blood in March of 1995, but Blood refused to execute the agreement. Instead, Blood tendered an alternative proposal to Titan. As one might suspect, there were material differences between these two contracts and Titan refused to execute the Blood's agreement. Subsequently, Titan sent several form contracts to Blood for his execution, which he refused to execute. But the parties continued to work together and Titan continued to pursue its licensing undertaking.

In connection with its licensing undertaking Titan licensed products featuring the name and likeness of "Ricky 'the Dragon' Steamboat" and video productions including, in greater or

lesser degrees, his performances.  Blood received information about Titan's licensing plans and its royalty scheme via a letter dated June 24, 1986 and Titan paid Blood royalties pursuant to its system over the next eight years.  Blood also participated in activities designed to promote the sale of these items and he was paid for these appearances.[1]  In connection with these promotional efforts, Blood appeared in commercials aired on Titan programs promoting the sale of dolls made in the likeness of WWF wrestlers including a doll made in the likeness of "Ricky 'the Dragon' Steamboat".  And beginning in April of 1986 Blood began to receive royalties pursuant to Titan's licensing scheme.[2]  Thus, Blood knew about videocassettes and merchandise licensed by Titan as early as 1986, and he accepted these royalty payments until about March of 1994.  In fact, Blood himself sold WWF photographs and posters at his gym.

On April 20, 1987, Blood applied to the Patent and Trade Office ("PTO") to register a servicemark for "Ricky Steamboat" although he was still wrestling in the WWF as "Ricky 'the Dragon' Steamboat" and he was still promoting the sale of products employing that name. When the PTO rejected this application as deficient, Blood amended his application on November 3, 1987 to indicate that his servicemark for entertainment services "namely performing in

---

[1]   The evidence shows that: on or about 3/5/86 Blood appeared at the Hecht's Department Store, in Protorville OH. to promote dolls and he was paid $2,250.00; on or about 9/28/86 he appeared at a Macy's in Atlanta, GA., to promote videocassettes and he was paid $2,250.00; on or about 11/9/86 he appeared at Belleville Tobacco, in Belleville, N.J. to promote various products licensed by Titan and was paid $2,250.00; he appeared on or about 3/19/87 at a Toy Fir to promote products licensed by Titan and he was paid $1,000.00; he appeared on or about 4/11/87 at Hudson Mall in N.J. to promote products licensed by Titan and was paid $3,450.00; he appeared at Fair Lane Village Mall in Pottsville, PA, to promote products licensed by Titan and was paid $3,750.00; he appeared on or about 4/4/87 at RKO Video Shack in New York to promote A&H Video videotapes and was paid $3,000; on or about 11/6/87 he appeared at Sundial Beach and Tennis Resort, Sanibel Island, FL to promote Gold Bond Ice Cream and was paid $2,250.00.

[2]   A table of royalties paid by Titan to Blood is set forth in Appendix A.

4

wrestling exhibitions." Later, on July 12, 1988, the PTO issued a registration for the "Ricky Steamboat" mark to Blood. In May of 1988 he applied to the PTO for a servicemark for "the Dragon" and later, in February of 1989, the PTO issued a service mark "The Dragon" to Blood to be used for performing wrestling exhibitions.

Blood continued to wrestle for the WWF through April of 1988 at which time he left the organization. After his departure, Blood took employment with the WWF's competitor, World Championship Wrestling ("WCW"), and during his stint with WCW Blood appeared as "Ricky the Dragon Steamboat". Nonetheless, Titan continued to license and market materials utilizing the "Ricky 'the Dragon' Steamboat" persona even though he was now wrestling for its competitor. No suit arose from this activity.

On or about September 22, 1988 Blood sent a letter to Titan regarding its licensing scheme. Blood advanced two complaints. In part, he asserted that he had not received the royalty payments to which he was entitled on certain products utilizing his name and likeness such as wrestling cards, lunchboxes, pajamas, etc. In another portion of that letter Blood asserted that he was not under contract with Titan and that he owned his own trademarks and copyrights such that he had retained his right to receive compensation for any video in which he appeared (rather than receiving royalties on just those videos in which he was featured as Titan's royalty system provided). In this letter Blood acknowledged the existence of, but rejected in this letter, Titan's claim that it owned the "Ricky 'the Dragon' Steamboat" mark. In the series of letters that follow Titan rejected Blood's claim that he owned this mark and asserted that it was paying Blood all the royalties to which he was entitled under Titan's royalty system.

Yet these discussion ended with these letters and each party proceeded as it had before. For its part, Titan continued to license and receive royalties on products incorporating the name

and likeness of "Ricky 'the Dragon' Steamboat" and it continued to pay royalties on these products to Blood consistent with its royalty system. For his part, Blood continued to accept these royalty payments from Titan and he never demanded that Titan stop using his name or likeness. Blood also admits that he knew about Titan's licensing activities and he weighed whether he should bring suit after consulting with counsel but ultimately decided not to do so.

Blood rejoined the WWF in January of 1991. In connection with this second "tour" Blood executed a written contract with a two year term. The contract gave Titan the exclusive right to videotape, film, photograph, and record any or all events in which he appeared, it specifically authorized the reproduction and sale of all programs on which he appeared via videocassettes, it granted Titan an exclusive license to use his servicemarks and exploit or otherwise use all intellectual property, and it provided a formula for the payment of royalties to Blood. In section 1.2 of the contract Titan promised that it would endeavor to book Blood in a minimum of ten bookings per year. In section 9.6 of the agreement Blood promised to "finish" all matches in accordance with the promoter's directions. According to Blood he was induced to execute this contract by McMahon's oral representation that Blood would be promoted as a "main eventer" but he was booked for bottom-of-the-barrel matches scheduled all over the country and paid relatively insubstantial sums for such showings.[3]

Blood called McMahon in mid-October 1991 to complain about this conduct and to indicate that he was terminating his contract. And no one disputes that Blood sought a release from the contract and that McMahon told Blood that he could wrestle until on or about December 2, 1991 after which he could walk away from the contract. As things turned out Blood was fired

---

[3]   "Main eventer" is a term that distinguishes well-known wrestlers who participate in "main events" from lesser characters (known as "jobbers") who wrestle in events that have less importance in the world of wrestling.

by McMahon in October of 1991.  Basically, McMahon ordered Blood to lose to other (lesser) wrestling characters in televised matches and when Blood refused to "take the fall" McMahon fired him on the spot.  According to Titan, McMahon's decision that Blood should "take the fall" to make room for up-and-coming wrestlers was consistent with prior precedent (because Blood told them he was retiring from wrestling and retiring wrestlers often take a fall for up-and-coming characters) and it was also consistent with Blood's contract (paragraph 9.6 provides that matches shall be finished in accordance with the Promoter's direction).

After Blood left the WWF for this second time he signed on again with WCW.  Blood signed this contract with WCW on November 19, 1991 and had his first match for WCW that same day.  During this same period Blood wrote Titan asserting that Titan had breached the contract and requesting that the parties mutually release one another from the agreement pursuant to its provisions.

Until 1994 the courses of conduct at issue in this suit remained consistent.  Titan continued to receive royalties on products and videocassettes incorporating the "Ricky 'the Dragon' Steamboat" persona, it continued to pay Blood royalties on those products consistent with its royalty system, and Blood cashed those royalty checks.  But things changed in March of 1994, when Blood's new counsel informed Titan that it would no longer cash those checks.

Blood brought suit in 1994.  In his multi-count complaint Blood sought damages and other relief on the theory that Titan's conduct constituted trademark infringement in violation of 15 U.S.C. § 1114 (Count I), false designation of origin in violation of 15 U.S.C. § 1125(a) (count II), unfair and deceptive trade practices in violation of N.C.Gen. Stat. § 75-16 (Count III), commonlaw trademark infringement and unfair competition (Count IV), misappropriation of name and likeness in violation of his commonlaw right of publicity (Count V) and his commonlaw

7

right of privacy (Count VI), and misrepresentation (Count VII).  Blood sought rescission of the 1991 contract on the grounds of fraudulent inducement (Count VIII), recovery in quantum meruit (Count IX) as well as recovery for unjust enrichment (Count X) and other monetary and equitable relief.  Blood also sued A&H Video on the theory that it was a joint venturer with Titan with respect to the production and marketing of videocassettes in violation of Blood's statutory and commonlaw rights such that A&H was liable to him as a joint venturer.

## II.  DISPOSITION

The matter is now before the Court on Titan's motion for summary judgment.  Titan's motion has several basic themes.  Titan argues that Blood's claims are barred by his implied or express contractual consent to the use of his name and likeness as well as the related doctrines of estoppel by acquiescence and estoppel by laches.  Titan also asserts that Blood's claims arising from his first tour with the WWF are barred by the applicable statute of limitations, and it asserts that any claim for videocassette royalties or their equivalent in damages is preempted (and barred) by the Copyright Act.

Titan's motion rests, in large part, on its contention that the undisputable facts of this case establish the defenses above such that no reasonable person could return a verdict for Blood on any of his claims.  "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986) *citing* Fed.R.Civ.Proc. 56(c).  However, Rule 56 does not require the moving party to produce evidence negating an opponent's claim.  *Celotex Corp. v. Catrett*, 106 S.Ct. at 2553.  That is, "under *Celotex*, 'the moving party on a summary judgment motion need not produce evidence, but

8

simply can argue that there is an absence of evidence by which the nonmovant can prove his case.'" *Cray Communications v. Novatel Cmptr. Systems, Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) (*citing* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2720 at 10). This is because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . ." *Celotex*, 106 S.Ct. at 255.

"Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995) *citing Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510, and this burden is particularly important where the nonmoving party bears the burden of proof. *Hughes v. Bedsloe*, 48 F.3d 1376, 1381 (4th Cir. 1995) "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 106 S.Ct. at 2511. Put another way, there must be a genuine issue for trial. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 106 S.Ct. at 2512. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict..." *Id*. Where, as here, a party moves for summary judgment based on lack of proof as to material facts, "the judge must ask himself. . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 106 S.Ct. at 2512.

As with any summary judgment motion, "the court must draw any permissible inference from the underlying facts established in the record in the light most favorable to the non-moving

9

party." *Austin v. Clark Equipment Co.*, 48 F.3d 833, 835 (1995).  But in order for an inference to be permissible it must be reasonable, and "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in 'light of the competing inferences' to the contrary." *Sylvia*, 48 F.3d at 818, *citing Matsushita Elec. Indus. Co. v. Zenith Radio*, 106 S.Ct. 1348, 1356 (1986).  As the Fourth Circuit has stated:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Sylvia*, 48 F.3d at 818 *citing Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (1958) (brackets in original). In short, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 106 S.Ct. 1348, 1356 (1986).

In the context of a motion for summary judgment "the substantive law will identify which facts are material." *Anderson*, 106 S.Ct. at 2510.  And in this case, that law arises from the claims advanced by Blood.  The Court will discuss each of the claims and the Defendant's motion on these claims below.

A.  Blood's Federal Claims.

Blood alleges that Titan has infringed in violation of 15 U.S.C. §§ 1114 & 1125(a).  Titan argues that Blood's claims are barred by the equitable defenses of estoppel by laches and estoppel by acquiescence.  The Court agrees that Blood's claims for money damages are barred by these doctrines given the facts of this case.

It is well established that "in a trademark case, Courts may apply the doctrine of estoppel

10

by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress." Sara Lee, 81 F.3d at 455. In determining whether laches may operate as a defense to an infringement claim, a court should ordinarily consider (1) whether the owner of the trademark knew of the infringing use, (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable, and (3) whether the infringing user has been unduly prejudiced by the owner's delay. *Id.* at n. 7. Also, "[a]n infringement action may be barred by the doctrine of estoppel by acquiescence where the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement." *Id.* at p. 462; *see also Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039 (4th Cir. 1984); *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc.*, 165 F.2d 693 (4th Cir. 1947). The difference between estoppel by laches and estoppel by acquiescence turns on whether the alleged consent to use of the plaintiff's mark was active (express or implied) or passive. *See Sara Lee*, 81 F.3d at 463 ("Although the doctrines of acquiescence and laches, in the context of trademark law, both connote consent by the owner to an infringing use of his mark, acquiescence implies active consent, while laches implies a merely passive consent.").

If estoppel by laches or estoppel by acquiescence are established, an accounting for past profits is denied even where the defendants acted fraudulently or with knowledge of the plaintiff's rights. *See Brittingham v. Jenkins*, 914 F.2d 447, 457 (4th Cir. 1990); *Skippy, Inc. v. CPC International, Inc.*, 674 F.2d 209, 216 (4th Cir. 1982). But as a general matter prospective relief is not barred through estoppel by laches or acquiescence. *See Brittingham*, 914 F.2d at 457 ("as to laches and acquiescence"); *see also Sara Lee*, 81 F.3d at 461 (noting that implied consent through a course of business dealings is one of several factors to be considered when determining

whether laches bars injunctive relief), and the doctrines generally do not bar prospective relief where there is a strong showing of a likelihood of consumer confusion. *See Sara Lee*, 81 F.3d at 461, 463. The Fourth Circuit has noted that using estoppel by laches to bar in*junctive relief* is proper only where there are aggravating factors which cause the balance of the equities to shift even further to the defendant's advantage such as (1) delay during which the mark passed into usage as a generic name, (2) a grossly long period of delay, (3) dubious proof of likelihood of confusion, (4) doubt as to the plaintiff's title to the mark (5) prior business dealings between the parties that result in the plaintiff impliedly consenting to the defendant's infringement, and (6) the defendant's good-faith development of a specific territorial area. *Sara Lee*, 81 F.3d at 461 n. 4. And insofar as "prior business dealings between the parties that result in the plaintiff impliedly consenting to the defendant's infringement" weigh in favor of denying prospective relief, a showing that would support estoppel by acquiescence supports a bar to that relief, as the Fourth Circuit has recognized. *See Ambrosia*, 165 F.2d at 694-96 (affirmative encouragement of use of mark bars claim for permanent injunctive relief).

Seen in light of these legal principles the Court finds that Blood is estopped by acquiescence and laches from any claim for money damages as a matter of law. Confronted with the massive evidence of Blood's knowledge about Titan's use of his mark and his affirmative participation in Titan's marketing efforts, any inference that Blood did not acquiesce in the use of his mark is unreasonable in light of competing inferences. Similarly, Blood's acceptance of royalty checks until 1994 both encouraged Titan to believe that Blood acquiesced in the use of his mark; and those royalty payments as well as Titan's ten years of licensing efforts clearly establish that prejudice needed to justify the use of estoppel.

Blood's effort to avoid estoppel by acquiescence are wholly unpersuasive. Here, Blood

repeatedly emphasizes that he never signed a contract and argues that a reasonable person could find that he did not acquiesce to use of his mark. But the doctrine of estoppel by acquiescence does not require a contractual agreement. In the ordinary case, the senior mark-holder is estopped upon a mere showing that he knew about the infringing use but expressly or impliedly consented to it even though the mark-holder received no consideration at all, *see e.g. Ambrosia, supra; Newton v. Thomason*, 22 F.3d 1455 (9th Cir. 1994); *N.A.A.C.P. v. N.A.A.C.P. Legal Defense & Educ.*, 753 F.2d 131 (D.C. Cir. 1985); *Conans Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir. 1985); *see also Artcraft Novelties v. Baxter Lane Co. of Amarillo*, 685 F.2d 988, 990-91 (5th Cir. 1982) (Defendant's assistance in plaintiff's sale of goods arguably infringing on Defendant's mark barred prior use defense), so the mere absence of a written contract cannot serve to undermine the eight year course of conduct outlined above: actions speak much louder than words. For the same reason, Blood's effort to rescind the short-lived 1991 contract with its provisions authorizing Blood's use of the mark is also unavailing; given the course of conduct above -- which establishes Blood's acquiescence to the use of his mark quite apart from the existence of any written contractual consent or license -- any inference that Blood's consent to Titan's use of his mark during this period because of the contract is patently unreasonable in light of competing inferences to the contrary.[4]

Likewise, Blood's effort to excuse his delay based upon negotiations must fail. For one thing, he has failed to show that there were negotiations as opposed to a stated difference of opinion that became quite clear almost immediately, but which did not spur Blood to action.

---

[4] For the same reason Blood's claim that he was induced to forgo asserting his rights by reason of the 1991 contract is likewise insufficient to create a reasonable inference. The Court also notes that there is no evidence that McMahon told him he had to forgo pursuing his claim against Titan in order to be rehired and the only lawsuit pending at this time was the one between Blood and the WCW, a suit which was settled eventually.

13

More importantly, Blood has pointed to no authority which supports the proposition that on-going negotiations might excuse the acceptance of royalties and the Court is compelled to conclude that the mere absence of a signed contract cannot suffice to undo his consent and acceptance of benefits in the form of royalty payments.  As noted earlier, plaintiffs are frequently barred from damages without any showing that they have accepted the benefits of alleged infringement; how much more then should the bar operate where such benefits have been conferred and accepted. Finally, any period of time which reasonably might be attributed to negotiations would not excuse Blood's decision to sit on his rights and collect royalty payments for the ensuing period.  Again, actions speak louder than words.

Blood's efforts to emphasize the absence of a negotiated written contract simply serve to highlight that this case is really about:  enlisting a jury for the purpose of imposing a more favorable royalty deal upon Titan at this late date.  For about eight years Blood took royalties from Titan pursuant to Titan's royalty program asserting that he should be paid more, but eager to accept the benefits of Titan's licensing and marketing plan -- thereby avoiding the costs and risks of pursuing such efforts alone and allowing Titan to undertake efforts from which he benefited.  By his own admission, Blood knew he could bring suit early on but decided not to do so which is unremarkable given the benefits he derived from Titan's efforts.  Now that his wrestling career has ended Blood wants to go back and create a new royalty scheme so he can reap greater benefits from Titan's licensing and the related marketing.  But the equitable defenses of laches and acquiescence are designed to prevent the very type of prejudice that Defendants who have invested so much time and effort would suffer, *see e.g. Ambrosia,* 165 F.2d at 695 (where defendant built up a large and lucrative business in light of plaintiff's acquiescence, plaintiff was estopped to destroy that business via an injunction); *Newton v. Thomason,* 22 F.3d

14

1455 (9th Cir. 1994); *N.A.A.C.P. v. N.A.A.C.P. Legal Defense & Educ.*, 753 F.2d 131 (D.C. Cir. 1985); *Conans Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir. 1985); *see also Artcraft Novelties v. Baxter Lane Co. of Amarillo*, 685 F.2d 988, 990-91 (5th Cir. 1982) (Defendant's assistance in plaintiff's sale of goods arguably infringing on Defendant's mark barred prior use defense); *Dwinell-Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2nd Cir. 1943) ("[t]he owner [of the mark] may have so conducted himself as impliedly to assure the newcomer that he does not object and the newcomer may have built upon that assurance), and that prejudice suffices quite apart from the actual payment of royalties to the Defendant. For these reasons, the Court finds that Blood's claim for money damages arising from the use of his mark is barred by the defense of estoppel by acquiescence and laches.[5]

That leaves Blood's claim for injunctive relief. As a general matter, the Court notes that the test for entering a permanent injunction is based on the test for granting preliminary injunctive relief with some important alterations. *See Wilson v. Champus*, 65 F.3d 361, 364 (4th Cir. 1995) *(citing Amoco Production Co. v. Village of Gambell*, 107 S.Ct. 1396, 1404 n. 12). The test for preliminary relief requires the Court to consider: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest. *L.J. v. Massinga*, 838 F.2d 118, 120 (4th Cir. 1988). One difference in the treatment of a request for permanent relief is that such a request implicates the a party's actual success on the merits. *See Amoco*, 107 S.Ct. at 1404 n. 12. Another difference

---

[5]   The Court takes it for granted that Titan has continued to tender royalty payments to Blood consistent with its royalty scheme since this suit was filed and the Court's holding in this regard is conditioned on Titan's payment of such royalties up through the entry of judgment in this case.

in the treatment of a request for permanent injunctive relief, is that the focus on irreparable harm shifts to a focus on whether legal remedies are inadequate. *See e.g. Walgreen Co. v. Sara Creek Property*, 966 F.2d 273,275 (7th Cir. 1992).

And, as noted earlier, in the context of an infringement action the general rule is that prospective relief is not barred through estoppel by laches or acquiescence or in cases where there is willful infringement or a strong showing of a likelihood of consumer confusion. *See Brittingham,* 914 F.2d at 457 ("as to laches and acquiescence"); *see also Sara Lee*, 81 F.3d at 461, 463. The Fourth Circuit has noted that using estoppel by laches to bar injunctive relief is proper only where there are aggravating factors which cause the balance of the equities to shift even further to the defendant's advantage such as (1) delay during which the mark passed into usage as a generic name, (2) a grossly long period of delay, (3) dubious proof of likelihood of confusion, (4) doubt as to the plaintiff's title to the mark (5) prior business dealings between the parties that result in the plaintiff impliedly consenting to the defendant's infringement, and (6) the defendant's good-faith development of a specific territorial area. *Sara Lee*, 81 F.3d at 461 n. 4.

The Court finds that Blood is not entitled to an injunction prohibiting Titan from marketing the videocassettes at issue in this dispute. As an initial matter, the Court notes that Blood has no copyright claim before the Court; instead Blood advanced his claim under the Lanham Act and various state-law torts. The Court also notes that the precise factual bases (if any) for Blood's claims as they relate to the videocassettes remains unclear.[6] The gravamen of

---

[6]   The Court is at a loss to determine the actual factual basis for Blood's claim even though he was given an additional opportunity to address these matters in a supplemental brief directed specifically to these issues.  In his response to the motion for summary judgment Blood did nothing but incorporate a brief he had submitted earlier in response to Titan's Rule 11, motion where Titan alleged that Blood's Lanham Act and state-law claims were frivolous insofar as they

Blood's claims in general is that Titan had no right to sell videos in which he appears without paying him a royalty. Apart from this claim the only allegation the Court can distill from Blood's briefing is an assertion that a fine-print legend on the videocassette packaging, which recites Titan's claim that it owns the trademarks of the wrestlers, violates the Lanham act.

The Court finds that Blood's claims for royalties or damages from the videocassette sales fails as a matter of law such that any injunctive relief is inappropriate. Here, the Court agrees that Blood's claim for royalties on the videocassettes is governed by the Copyright Act. In this case it is undisputed that Titan secured the videotaping of wrestling matches in connection with its WWF undertaking and, as Titan notes, the Copyright Act gives protection to such original works of authorship including such audio-visual works, see 17 U.S.C. § 102(a), and confers exclusive rights on the copyright owner. See 17 U.S.C. § 106. The Court agrees that Titan's copyrights subsists in the videotapes themselves and that copyrights do not subsist in any performance rendered by Blood. *See Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663 (7th Cir. 1986); *N.B.A. v. Motorola*, 105 F.3d 841 (2nd Cir. 1997). And it is well established that the Copyright Act preempts all legal or equitable rights that are the equivalent of any of the exclusive rights within the scope of  act unless he can show that such claims survive the preemption of such claims. See 17 U.S.C. § 301(a).

The Court agrees with Titan that Blood cannot advance a claim for unauthorized reproduction and distribution of the videocassettes under the Lanham Act, because such claims are governed by the Copyright Act which gives Blood no rights in Titan's videocassettes. Blood

---

related to its creation and distribution of the videocassettes at issue; but that briefing was plainly inadequate to address the motion for summary judgment. Despite this manifest failure, the Court gave Blood another opportunity to address these issues, but Blood's newest brief is no more illuminating.

notes that the copyright act does not limit any rights or remedies he has under any other federal statute, see 17 U.S.C. § 301(d); he notes that the Lanham and Copyright Acts provide overlapping protection; and he argues that this allows him to advance his (nebulous) claims for royalties or damages for the unauthorized reproduction of his performances.  The Court agrees that § 301(d) protects Blood's right to advance an appropriate Lanham Act claim, but it believes Blood cannot use the Lanham Act to challenge Titan's ownership of the videocassettes and advance claims for royalties.  The Copyright Act is a statute specifically designed to address copyrights and by its terms it creates exclusive rights in covered works.  It is true that the Copyright and Lanham Acts provide overlapping protection, but by their terms these acts protect different aspects of the same property.  Allowing Blood to advance what are essentially royalty claims under the Lanham Act  defies common-sense and the Court's duty to make "sense rather than nonsense of the corpus juris."  *West Virginia Univ. Hosp. v. Casey*, 111 S.Ct. 1138, 1148 (1991).

The Court also finds that summary judgment is appropriate as to Blood's other Lanham Act claims.  Here, the Court notes that the videocassette packaging clearly indicates that they are "WWF Official Video" in large print on the front of the cassette package.  The only factual basis for Blood's Lanham Act claims that can be gleaned from Blood's briefing is a fine-print legend on the bottom of the back of the videocassette packaging which states that "[a]ll wrestlers' names are trademarks of Titan Sports, Inc."  But Blood has produced absolutely no evidence showing that this fine-print legend created actual confusion as to the source of the videocassettes or even a likelihood of such confusion, this representation does not even relate to the source of the videocassettes, and it is hardly discernible.  For these reasons the Court finds that this fine-print legend stating that Titan has a trademark in the wrestlers' names is simply not enough to create

18

a genuine issue of material fact with respect to the source of the videocassettes and it cannot provide a viable basis for any injunctive relief as to any of Blood's Lanham Act claims.[7]

The Court also finds that all of Blood's state-law claims are preempted by the Copyright Act. Here, the Court agrees that under the Copyright Act the copyright subsists in the videotapes themselves not any performance rendered by Blood and that § 301(a) preempts Blood's state-law claims to the extent they seek damages for the unauthorized reproduction or distribution of the videocassettes (which appears to be the gravamen of Blood's claim). *See Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663 (7th Cir. 1986); *N.B.A. v. Motorola*, 105 F.3d 841 (2nd Cir. 1997). As Blood notes, state-law claims can survive copyright preemption, but in order to do so such claims "must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by federal copyright law." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993). The Court finds that Blood has utterly failed to show -- as a legal or factual matter -- why his state-law claims are not preempted under this test insofar as those claims relate to the videocassettes at issue, and therefore, the Court finds that these state-law claims do not provide a basis for injunctive relief.

That leaves Blood's request for injunctive relief as it relates to the sale of other merchandise utilizing his name and likeness such as dolls, cards, lunch-boxes etc.

Viewed in light of the relevant legal considerations it is evident that Blood's request for injunctive relief requires a close call. On the one hand, the evidence of record clearly compels the conclusion that Blood has commonlaw rights and statutory rights in the mark "Ricky 'the

---

[7]   Indeed this would be true even if Blood had produced evidence that he marketed similar goods, something he has not done.

19

Dragon' Steamboat."  The evidence also shows that Titan deliberately utilized that mark for its products despite Blood's initial protest and the evidence shows that Titan asked Blood to execute a contract authorizing the use of the mark and it voluntarily paid royalties to Blood, tacit admissions that he owned the mark.  This evidence of knowing infringement militates in favor of granting injunctive relief.  And although it is true, as Titan notes, that Blood has mustered absolutely no competent evidence of customer confusion, it is also true, as Blood notes, that where there is evidence of intentional copying or use of the mark (as in this case) such evidence creates a presumption of infringement that Titan is obliged to rebut, something Titan has failed to do in a peremptory manner. *See Osem Food Industries, Ltd. v. Sherwood Foods, Inc.,* 917 F.2d 161, 164-65 (4th Cir. 1990).

On the other hand, Blood's acquiescence in the use of his mark and the acceptance of royalties amounts to prior business dealings between the parties that result in the plaintiff impliedly consenting to the defendant's infringement, *see Sara Lee,* 81 F.3d at 461 n. 4, and such conduct favors Titan's claim that Blood should be barred from seeking injunctive relief. *In Sara Lee, supra,* the Fourth Circuit cited its prior opinion in *Ambrosia, supra,* where the Court had held that the plaintiff's encouragement in the use of the mark barred any request for injunctive relief. *See Ambrosia,* 165 F.2d at 694-96 (affirmative encouragement of use of mark bars claim for permanent injunctive relief).   And other Courts have noted that such affirmative representations justify barring injunctive relief. *See e.g. Newton v. Thomason,* 22 F.3d 1455 (9th Cir. 1994); *N.A.A.C.P. v. N.A.A.C.P. Legal Defense & Educ.,* 753 F.2d 131 (D.C. Cir. 1985); *Conans Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145 (5th Cir. 1985)   The Court also notes the evidence that Blood sold WWF posters and photos at his gym, there is no evidence that Blood has licensed or marketed any products on his own, and Blood has delayed a very long time

20

before taking any action to defend his mark. These factors create a strong inference that there is no real likelihood of confusion. *See e.g. Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) (lack of vigilance in protecting mark undercuts contention that there is a likelihood of confusion). And it is these factors, as well as Titan's tendering of royalties to Blood and Blood's acceptance of those royalties which persuade the Court that Titan's hands are not so unclean that it cannot avail itself of estoppel by laches or acquiescence. In short, there are no clean hands here and that cuts both ways.

Given these competing interest the Court finds that an injunction prohibiting Titan from any further marketing of non-videocassette merchandise such as dolls, card, lunch-boxes etc. that utilize the name or likeness of "Ricky 'the Dragon' Steamboat" is appropriate. As Blood notes, to the extent this merchandise incorporates his persona there is some basis for a reasonable inference that he has approved of the product. Also, there is no doubt that Titan deliberately expropriated Blood's persona to market this merchandise and there is a sense in which Blood's acquiescence has been nurtured by Titan's royalty payments. If Blood is dissatisfied with these payments he should be able to market his own goods. The Court will enter an order consistent with this finding.

B. Blood's state law claims.

Blood has also advanced numerous state-law claims.[8] But it is apparent that any of Blood's state law claims for damages that survive preemption are also barred by his consent, acquiescence and acceptance of benefits, as well as his delay under the doctrines of quasi-estoppel

---

[8]   Titan's claims for unfair and deceptive trade practices in violation of N.C.Gen. Stat. § 75-16 (Count III), commonlaw trademark infringement and unfair competition (Count IV), misappropriation of name and likeness in violation of his commonlaw right of publicity (Count V) and his commonlaw right of privacy (Count VI).

and laches.

The doctrine of estoppel "rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." *Thompson v. Soles,* 299 N.C. 484 (1980).  "The rule is grounded in the premise that it offends every principle of equity and morality to permit a party to enjoy the benefits of a transaction and at the same time deny its terms or qualifications. *Id.; see also Brooks v. Hackney,* 329 N.C. 166, 173 (1991) ("It is well settled that a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.").  Where the estoppel flows from the acceptance of benefits, it is sometimes referred to as "quasi-estoppel" and this doctrine provides that "[w]here one having the right to accept or reject a transaction or instrument takes and retained benefits thereunder, he ratifies it, and cannot avoid its obligation or effect by taking a position inconsistent with it." *Carolina Medicorp v. Bd. of Trustees of the State Medical Plan,* 118 N.C.App. 485, 492 (quotations and citations omitted); *see also Advertising, Inc. v. Harper,* 7 N.C. App. 501, 505 (1970).  Also, under North Carolina law the doctrine of estoppel by laches bars claims where the plaintiff "can be shown to lack the diligence which may be expected from a reasonable and prudent man." *Taylor v. City of Raleigh,* 22 N.C.App. 259, 261 (1974); *see also Builders Supplies Co. v. Gainey,* 282 N.C. 261, 271 (1972).  Mere delay is not enough to create the bar; rather "[t]he question is primarily whether the delay in acting results in an inequity to the one against whom the claim is asserted based upon some change in the condition or relations of the property or parties." *McRorie v. Query,* 32 N.C.App. 311, 323 (1977) *(citing Wynee v. Conrad,* 220 N.C. 355 (1941).  In this case, Blood accepted Titan's royalty payments from 1986 through 1994 well-knowing the terms and conditions of that tender; he actually participated in marketing those goods, he acquiesced in the

22

marketing of those goods, and he delayed for eight years before bringing this suit.  Under these circumstances, the Court finds that Blood's state-law claims for money damages as a result of Titan's use of his mark is barred by the doctrines of quasi-estoppel and laches.

Blood's other state-law claims fail for additional reasons. In Count VII of his complaint, Blood set forth a claim for misrepresentation alleging that "Titan continuously, actively and intentionally concealed from plaintiff, or as a result of its failure to exercise reasonable care and competence, misled plaintiff by failing to communicate to plaintiff before the fact information as to: what products were going to be marketed, distributed, licensed and sold; when; in what form; where; in what amounts; by which licensee; quality control; approval procedures; the expected or actual revenue derived; and the amount of royalties payable, if any." The Court finds that evidence of record clearly defeats any claim of misrepresentation as a matter of law.  From the outset, Titan disclosed its licensing plan to the wrestlers in numerous letters, Blood received those letters and has admitted actual knowledge of Titan's licensing plan, when Titan licensed merchandise or sold videocassettes pursuant to its plan, Blood helped market its products and accepted royalty payments from the Titan for about eight years, and in connection with those royalty payments he received reports clearly indicating the products Titan had licensed utilizing his mark.  Given this knowledge Blood simply cannot establish a material misrepresentation. Moreover, any reliance on misrepresentations concerning Titan's licensing etc. would be patently unreasonable given his knowledge of Titan's activities, the nature of Blood's objection (I never authorized use of my mark), and the long record of royalty reports that Titan provided to Blood which disclose the nature and extent of its licensing activities.[9]  Indeed Blood has failed to

---

[9]  As Titan notes, Blood seems to be trying to shift the nature of his misrepresentation in the briefing now before the Court.  But this claim was not pleaded such that it is not properly before the Court and Blood has not mustered evidence of record in this case that would be

produce any significantly probative evidence on these points.

Blood's claims for quantum meruit or unjust enrichment and rescission also fail as a matter of law quite apart from the bar created by estoppel and laches.  Quantum meruit is an implied-in-law contract requiring proof that services were rendered and knowingly accepted with a mutual understanding or reasonable belief that the Plaintiff would be compensated for his efforts. *See Envt'l. Landscape Design Specialist v. Shields*, 75 N.C. App 304, 306 (1985); *Suggs v. Norris*, 88 N.C. App. 539, 544 (1985), and it is well established that the theory does not come into play simply because a party believes, in hindsight, that they should have received more compensation for their efforts. *See e.g. Peace River Elec. Co-op, Inc. v. Ward Transformer Co.*, 116 N.C. App. 493, (1994).  In this case, the evidence clearly shows that Blood knew that Titan was exploiting his mark pursuant to its licensing plan and compensating him according to its royalty scheme, and also, that Blood accepted the benefits of that royalty scheme.  Titan never manifested any intent to pay Blood royalties above and beyond what it has paid him; quite the contrary, Blood accepted the royalties tendered by Titan well-knowing the terms and conditions of that tender.  For the reasons given above the Court concludes that any contract that might be implied-in-law from this course of dealings would not entitle Blood to any additional compensation. Likewise, the Court also believes that any claim for unjust enrichment in this case must fail because that evidence does not establish any basis for a finding that Titan has received an unjust or unfair benefit; Blood simply believes that he should have received more for the use of his mark -- that he could have negotiated more favorable terms -- but as noted earlier this is simply not the kind of showing that will suffice to justify recourse to this equitable remedy.  Nor can Blood avail himself of the equitable remedy of recision of the 1991 contract for he has

_____

sufficient to support such a claim.

admitted that he breached that contract by failing to perform the "finishes" requested by Titan as required by the terms of the agreement and even under his theory of the case he continued to accept benefits under the contract he seeks to rescind for two years after that contract was terminated.   Under these circumstances, Blood is not entitled to recision as a matter of law.

## III. CONCLUSION

This case is an anomaly and neither the parties nor the Court have found one like it. Titan alleges that it is hypocritical for Blood to seek greater royalties on products bearing his mark given his receipt of benefits, but the accusation of hypocrisy rings hollow given Titan's misappropriation of the mark.   Yet Blood's rhetoric about Titan's "piracy" likewise rings hollow; given his acceptance of benefits for so long and his delay in asserting his rights Blood's effort to see if he can impose a better royalty deal now -- this time with the jury -- is likewise unappealing, and it ignores the obvious countervailing interest of fairness which arise where, as here, the mark-holder acquiesces to use of the mark.   Seen in the context of this dispute, it is apparent that the doctrines of estoppel by laches and acquiescence are well-calculated to balance the equities such hard cases present and it is clear that those doctrines reflect a vision of fairness which favors those who actively employ property and protect their marks.   In this case, Blood made no meaningful effort whatsoever to preserve his mark; quite the contrary he reaped the benefits of Titan's licensing efforts for some eight years, but now seeks to revisit the past in an effort to improve his lot on the theory that Titan's use was unauthorized.   For the reasons given above, the Court finds that Blood's claims must fail as a matter of law, and therefore, Titan's motion for summary judgment is granted except as to Blood's request for injunctive relief insofar as it relates to Titan's sale for merchandise not covered by the Copyright Act.

A separate Judgment will be filed simultaneously with this Memorandum of Decision.

25

IT IS SO ORDERED this the _136th_ day of May, 1997.

ROBERT D. POTTER
SENIOR UNITED STATES DISTRICT JUDGE

## APPENDIX "A"

| PERIOD | PRODUCTS | PAYMENT |
|---|---|---|
| 04/01/86 - 07//1/86 | Dolls, videos, cups, buttons, posters and keychains | $18,580.22 |
| 07/02/86 - 09/30/86 | Dolls, posters, headbands, and buttons | 24,549.18 |
| 10/01/86 - 12/31/86 | Ricky Steamboat videotape, wrestling cups, keychains, buttons, dolls, board games, T-shirts, posters and headbands | 24,643.07 |
| 01/01/87 - 03/31/87 | Ricky Steamboat videotape, dolls, board games, T-shirts, posters, and headbands | 5,176.27 |
| 04/01/87 - 06/30/87 | Ricky Steamboat videotape, dolls, board games, T-shirts, posters, and headbands | 8,285.23 |
| 07/01/87 - 09/30/87 | Ricky Steamboat videotape, dolls, board games, Gold Bond ice cream, T-shirts, posters, and headbands | 8,466.03 |
| 10/01/87 - 12/31/87 | Ricky Steamboat videotape, dolls, Topps chewing gum, T-shirts, posters, and headbands | 2,288.50 |
| 01/01/88 - 06/30/88 | Ricky Steamboat videotape, dolls, Topps chewing gum, T-shirts, posters, and headbands | 2,475.12 |

| PERIOD | PRODUCTS | PAYMENT |
|---|---|---|
| 1st quarter of 1989 (mail order and concession sales); 3rd and 4th quarters of 1988 (license royalties); 2nd and 3rd quarters of 1988 (LJN toy royalties) | Ricky Steamboat videotape, dolls, board games, T-shirts, school supplies manufactured and sold by Titan's licensee Plymouth, Inc., calendars and Gold Bond ice cream bars | $ 7,944.25 |
| 3rd and 4th quarters of 1989 | Ricky Steamboat videotape | 4.45 |
| 2nd quarter of 1991 (domestic concession sales); 2nd quarter of 1991 (mail order sales); 1st quarter of 1991 (licensee); 1st quarter of 1991 (toys); 4th quarter of 1990 (domestic and Canadian video sales) | T-shirts, photos and posters | 988.04 |
| 2nd quarter of 1991 (Canadian royalties - concession sales) | T-shirts | 36.12 |
| 3rd quarter of 1991 (domestic concession); 3rd quarter of 1991 (mail order sales); 2nd quarter (licensee and toys); 1st quarter of 1991 (domestic and Canadian video sales) | T-shirts, posters, and photos | 2,398.96 |
| 3rd quarter of 1991 (Canadian royalties - concession sales) | Photos, posters | 272.82 |
| 4th quarter of 1991 (Canadian royalties - concession sales) | Photos, posters | 52.13 |

| PERIOD | PRODUCTS | PAYMENT |
|---|---|---|
| 4th quarter of 1991 (domestic concession sales and mail order sales); 3rd quarter of 1991 (licensee sales); 3rd quarter of 1991 (toys); 2nd quarter of 1991 (domestic, Canadian and foreign video sales) | T-shirts, posters, photos | 1,151.49 |
| 1st quarter of 1992 (domestic concession sales and mail order sales); 4th quarter of 1991 (licensee sales and toy sales); 3rd quarter of 1991 (domestic, Canadian and foreign video sales) | Videos, playing cards, drawing plates, T-shirts, posters, trading cards, and photos | 2,067.21 |
| 1st quarter of 1992 (Canadian royalties - concession sales) | Playing cards, photos | 139.78 |
| 2nd quarter of 1992 (domestic concession sales and mail order sales); 1st quarter of 1992 (licensee sales and toy sales); 4th quarter of 1991 (domestic, Canadian and foreign video sales) | Videos, books, playing cards, drawing plates, posters, and photos | 444.56 |
| 2nd quarter of 1992 (Canadian royalties - concession sales) | Playing cards | 22.53 |
| 3rd quarter of 1992 (domestic concession sales and mail order sales); 2nd quarter of 1992 (licensee and toy sales); 1st quarter of 1992 (domestic, Canadian and foreign video sales) | Videos, magazines, playing cards, drawing plates, photos, calendars | 1,097.49 |
| 3rd quarter of 1992 (Canadian royalties - concession sales) | Playing cards | 20.36 -- |

3

| PERIOD | PRODUCTS | PAYMENT |
|---|---|---|
| 4th quarter of 1992 (domestic concession sales and mail order sales); 3rd quarter of 1992 (licensee and toy sales); 2nd quarter of 1992 (domestic, Canadian and foreign video sales) | Videos, toys, drawing plates, playing cards, photos, calendars | 4,482.13 |
| 4th quarter of 1992 (Canadian royalties - concession sales) | Playing cards, calendars | 92.47 |
| 1st quarter of 1993 (domestic concession sales and mail order sales); 4th quarter of 1992 (licensee and toy sales); July and August of 1992 (domestic and Canadian video sales) | Toys, magazines, trading cards, drawing plates, playing cards, calendars | 5,305.74 |
| 1st quarter of 1993 (Canadian royalties - concession sales) | Calendars | 42.17 |
| 2nd quarter of 1993 (domestic concession sales and mail order sales); 1st quarter of 1993 (licensee and toy sales); 9/92 (domestic video sales); 4th quarter of 1992 (domestic and Canadian video sales) | Videos, toys, playing cards, calendars | 1,420.97 |
| 3rd quarter of 1993 (concession and mail order sales); 2nd quarter of 1993 (licensee and toy sales); 1st quarter of 1993 (domestic video sales); 4th quarter of 1992 (domestic and Canadian video sales) | Videos, playing cards, toys, calendars | 675.89 |
| 4th quarter of 1993 (domestic concessions and mail order sales); 3rd quarter of 1993 (licensee and toy sales); 1st quarter of 1993 (Canadian video sales); 2nd quarter of 1993 (domestic video sales) | Videos, toys | 583.08 |

4

crl

United States District Court
for the
Western District of North Carolina
May 13, 1997

* * MAILING CERTIFICATE OF CLERK * *

Re:  3:94-cv-00307


True and correct copies of the attached were mailed by the clerk to the
following:

William C. Livingston, Esq.
Kennedy, Covington, Lobdell and Hickman
NationsBank Corporate Center
Suite 4200
100 North Tryon Street
Charlotte, NC  28202-4006

Alan C. Eidsness, Esq.
1200 Title Insurance Building
Minneapolis, MN  55401

David Bradley Olsen, Esq.
1200 Title Insurance Building
Minneapolis, MN  55401

Allan W. Singer, Esq.
Mitchell, Rallings, Singer, McGirt & Tissue
227 W. Trade St.
Suite 1800
Charlotte, NC  28202

Jerry S. McDevitt, Esq.
1500 Oliver Building
Pittsburgh, PA  15222

Steven S. Santoro, Esq.
1500 Oliver Building
Pittsburgh, PA· 15222

Terry Budd, Esq.
Kirkpatrick & Lockhart
1500 Oliver Bldg
Pisstburg, PA  15222

Michael D. McCoy, Esq.
Bell Seltzer Park & Gibson
P.O. Drawer 34009
1211 E. Morehead Street
Charlotte, NC  28234

George M. Taulbee, Esq.

Bell, Seltzer, Pai  & Gibson
P. O. Drawer 34009
Charlotte, NC  28234

cc:
Judge                          ( )
Magistrate Judge               ( )
U.S. Marshal                   ( )
Probation                      ( )
U.S. Attorney                  ( )
Atty. for Deft.                ( )
Defendant                      ( )
Warden                         ( )
Bureau of Prisons              ( )
Court Reporter                 ( )
Courtroom Deputy               ( )
Orig-Security                  ( )
Bankruptcy Clerk's Ofc.        ( )
Other_____         ( )

Date: 3/13/99

Frank G. Johns, Clerk

By: _____
        Deputy Clerk